**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com
          jvenditti@bursor.com

**BURSOR & FISHER, P.A**
Frederick J. Klorczyk III (State Bar No. 320783)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: fklorczyk@bursor.com

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY HAYMOND, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br> v.<br><br>LOVEVERY, INC.,<br><br>           Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR**<br><br>(1) UNFAIR COMPETITION<br>(2) CONVERSION<br>(3) FALSE ADVERTISING<br>(4) VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT<br>(5) UNJUST ENRICHMENT / RESTITUTION<br>(6) NEGLIGENT MISREPRESENTATION<br>(7) FRAUD<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kelly Haymond ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant Lovevery, Inc. ("Lovevery" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription plans for Lovevery-branded products and services that are available exclusively to consumers who enroll in Defendant's auto-renewal membership program (the "Play Kits" or "Lovevery Subscriptions," enumerated below) through its website at https://lovevery.com/ (the "Lovevery Website").  Defendant is an American corporation that produces, markets, advertises, sell, and distributes, among other things, educational toys, books, and games via play-kit subscription boxes that are designed to meet the developmental needs and brain development of toddlers and babies.  Relevant to Plaintiff's allegations, when consumers sign up for the Lovevery Subscriptions through the Lovevery Website, Defendant actually enrolls consumers in a program that automatically renews the Lovevery Subscriptions on a recurring basis and results in bimonthly or trimonthly charges to the consumer's credit card, debit card, or third-party payment account (collectively, "Payment Method").  In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to and obtained from California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq.*

2.      Through the Lovevery Website, Defendant markets, advertises, and sells to consumers in California and throughout the United States paid memberships to the Lovevery Subscriptions, which include "Baby Play Kits"[1] that are designed for baby's first 12 months of life

---

[1] "There are 6 total Baby Play Kits."  *See* Lovevery, *Frequently Asked Questions*, https://lovevery.com/pages/help (last accessed Feb. 16, 2023).  Specifically, Defendant offers the following Baby Play Kits: the Looker Play Kit (weeks 0-12); the Charmer Play Kit (months 3-4); the Senser Play Kit (months 5-6); the Inspector Play Kit (months 7-8); the Explorer Play Kit (months 9-10); and the Thinker Play Kit (months 11-12).  *See* https://lovevery.com/products/the-play-kits.  Each Baby Play Kit costs $80 per Play Kit, exclusive of taxes and fees.  *See id.*

and are shipped every two months, and "Toddler Play Kits"[2] that are designed for toddlers 13-48 months old and are shipped every quarter (collectively, the "Play Kits" or "Lovevery Subscriptions").

3.      Consumers can sign up for Defendant's Lovevery Subscriptions through the Lovevery Website.  To do so, customers must provide Defendant with their billing information, and Defendant then automatically charges customers' Payment Method as payments become due, which is roughly every two months for the Baby Play Kits and every three months for the Toddler Play Kits.  Defendant is then able to unilaterally charge its customers' renewal fees on a recurring basis without their consent, as it is in possession of its customers' billing information.  Thus, Defendant has made the deliberate decision to charge Plaintiff and other similarly situated customers on a recurring basis, absent their consent under the ARL, relying on consumer confusion and inertia to retain customers, combat consumer churn, and bolster its revenues.

4.      Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to California consumers must: (a) provide the complete auto-renewal terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to completion of the enrollment process, *see* Cal. Bus. Prof. Code § 17602(a)(1); (b) obtain consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (c) provide an acknowledgement identifying an easy and efficient mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).  As will be discussed below, the enrollment process for the Lovevery Subscriptions through the Lovevery Website uniformly violates each of the core requirements of the ARL.

---

[2] "There are 12 total Toddler Play Kits."  *See* Lovevery, *Frequently Asked Questions*, *supra*. Specifically, Defendant offers the following Toddler Play Kits: the Babbler Play Kit (months 13, 14, 15); the Adventurer Play Kit (months 16, 17, 18); the Realist Play Kit (months 19, 20, 21); the Companion Play Kit (months 22, 23, 24); the Helper Play Kit (months 25, 26, 27); the Enthusiast Play Kit (months 28, 29, 30); the Investigator Play Kit (months 31, 32, 33); the Free Spirit Play Kit (months 34, 35, 36); the Observer Play Kit (months 37, 38, 39); the Storyteller Play Kit (months 40, 41, 42); the Problem Solver Play Kit (months 43, 44, 45); and the Analyst Play Kit (months 46, 47, 48).  *See* https://lovevery.com/products/the-play-kits.  Each Toddler Play Kit costs $120 per Play Kit, exclusive of taxes and fees.  *See id*.

---

5.      Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1) of the ARL; (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2) of the ARL; and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Section 17602(a)(3) of the ARL.  *See* Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3); *see also id.* § 17601(b)(1)-(5) (setting forth definition of "automatic renewal offer terms" as used in Cal. Bus. Prof. Code § 17602(a)).  The acknowledgment also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Lovevery Subscriptions, in violation of Section 17602(c) of the ARL.

6.      As a result, all goods, wares, merchandise, or products sent to Plaintiff and the Class under the automatic renewal or continuous service agreements are deemed to be "unconditional gifts" under the ARL.  *See* Cal. Bus. & Prof. Code § 17603.

7.      For the foregoing reasons, Plaintiff brings this action individually and on behalf of all California purchasers of any of Defendant's Lovevery Subscriptions from the Lovevery Website who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their Lovevery Subscriptions.  Based on Defendant's unlawful conduct, Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, reasonable attorneys' fees and costs, and any other relief as the Court may deem proper, for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (ii) conversion; (iii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (iv) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (v) unjust enrichment/restitution; (vi) negligent misrepresentation; and (vii) fraud.

## THE PARTIES

8.      Plaintiff Kelly Haymond is a citizen of California, residing in Lancaster, California. On or around February 23, 2021, Ms. Haymond signed up for a Lovevery Subscription from Defendant's Website while in California.  At the time of her initial enrollment in February 2021, Ms. Haymond resided Rosamond, Kern County, California.  During the enrollment process, but before finally consenting to Defendant's subscription offering, thereby completing the checkout process, Ms. Haymond provided her billing information (her "Payment Method") directly to Defendant.  At the time Ms. Haymond enrolled in her Lovevery Subscription program, Defendant did not disclose to Ms. Haymond all of the required automatic renewal offer terms associated with the subscription program or obtain Ms. Haymond's affirmative consent to those terms.  Further, after Ms. Haymond completed her initial order, Defendant sent Ms. Haymond an email confirmation and receipt for her enrollment in the Lovevery Subscription (the "Acknowledgment Email").  However, the Acknowledgment Email, too, failed to provide Ms. Haymond with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. Haymond's Lovevery Subscription in a manner capable of being retained by her.  Ms. Haymond did not receive any other acknowledgement that contained the required information.  As a result, Ms. Haymond was not placed on notice of several material terms associated with her Lovevery Subscription.  In particular, based on the missing and/or inadequate disclosures of the Checkout Page and Acknowledgment Email, Ms. Haymond was not made aware of the fact that her Lovevery Subscription would automatically renew after delivery of the first Play Kit; of the recurring price to be charged upon renewal, that the amount would change, and to what; or of the length of the applicable renewal term(s) or when the renewal charges would occur.  Nor was she apprised of the complete cancellation policy associated with her Lovevery Subscription, the most crucial aspects of which were missing from the Checkout Page and the Acknowledgment Email.  Nevertheless, on or around April 20, 2021, Defendant automatically renewed Ms. Haymond's Lovevery Subscription and charged Ms. Haymond's Payment Method approximately $128.70—an amount approximately 50% higher than the initial amount charged to her Payment Method at the time of

1   enrollment (*i.e.*, $85.50) on or around February 23, 2021.  Promptly after learning of Defendant's

2   charges to her Payment Method, Ms. Haymond attempted to cancel her Lovevery Subscription in

3   order to avoid incurring any additional future charges, which she struggled to do due to

4   Defendant's obscured, confusing, and time-consuming cancellation policy.  Defendant's missing

5   and/or incomplete disclosures on the Checkout Page and in the Acknowledgment Email, its failure

6   to obtain Ms. Haymond's affirmative consent to the offer terms associated with the Lovevery

7   Subscription before charging her Payment Method on a recurring basis, and its subsequent failure

8   to issue a refund of those unauthorized charges, are contrary to the ARL, are contrary to the ARL,

9   which deems products provided in violation of the statute to be a gift to consumers.  *See* Cal. Bus.

10   & Prof. Code § 17603.  Had Defendant complied with the ARL, Ms. Haymond would have been

11   able to read and review the automatic renewal offer terms prior to purchase, and she would not

12   have subscribed to the Lovevery Subscription at all or on the same terms, or she would have

13   cancelled her Lovevery Subscription earlier, *i.e.*, prior to the expiration of the initial subscription

14   period and/or any subsequent renewal term.  As a direct result of Defendant's violations of the

15   ARL, Ms. Haymond suffered, and continues to suffer, economic injury.

16      9.      Defendant Lovevery, Inc. ("Lovevery" or "Defendant") is a Delaware corporation

17   with its principal place of business located at 918 W. Idaho Street, Boise, Idaho 83702.  Defendant

18   an American corporation that produces and curates bimonthly and trimonthly Play Kits containing,

19   among other things, educational toys, books, and games that are designed to meet the

20   developmental needs and brain development of toddlers and babies.  Relevant here, Defendant

21   offers access to certain exclusive Lovevery-branded content, products, and/or services on a contract

22   or fee basis to customers who enroll in the automatically renewing Lovevery Subscriptions.

23   Defendant wholly owns and operates the Lovevery Subscriptions, which it markets and sells to

24   consumers through the Lovevery Website.  Defendant is also responsible for the promotion,

25   advertisement, marketing, administration, and/or sale of the Lovevery Subscription program,

26   including the distribution of the Play Kits, and it owns and operates the Lovevery Website, through

27   which Defendant markets and sells the Lovevery Subscriptions.  Defendant also owns and operates

28   the Lovevery mobile application (the "Lovevery App"), and it is responsible for the production and

maintenance of the Lovevery App and the products, services, and/or digital goods provided thereon—benefits that are exclusively available to individuals enrolled in a paid Lovevery Subscription program.  Defendant sells – and, at all relevant times during the Class Period, has sold – the Lovevery Subscriptions in California, and it has done business in and throughout California and the United States at all times during the Class Period.  In connection with the Lovevery Subscriptions, Defendant has, at all relevant times, made (and continues to make) automatic renewal or continuous service offers to consumers in California and throughout the United States, via the Lovevery Website.

10.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from Defendant.

12.     This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a citizen of California, and submits to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, substantial business within California, including the marketing and sales of the automatic renewal programs at issue in this Complaint.  Defendant therefore has sufficient minimum contacts with this State, including within this District, and/or intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products and/or services to residents within this District and throughout this State. Additionally, Defendant marketed and sold the Lovevery Subscription to Plaintiff in this County.

13.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because

Defendant regularly does business in this County, and a substantial part of the events, omissions, and acts giving rise to the claims alleged herein occurred in this District, including the misrepresentations, omissions, and injuries discussed herein.

## FACTUAL ALLEGATIONS

### A.    Background On The Subscription Box Industry

14.    The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[3]  Subscription e-commerce services now target a wide range of customers and cater to a variety of specific interests. Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[4]  Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[5]  That constitutes an average annual growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[6]

---

[3] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[4] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[5] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").  *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

[6] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

15.     Defendant has been riding this wave.  Indeed, "[s]everal subscription services for kids such as … Lovevery … have recently entered the market, which is contributing to the growth of the toy and game industry."[7]  Relevant here, Lovevery was launched in 2017, and by October 2021 Defendant had already received a valuation of more than $800 million, marking a period of exponential growth in four short years.[8]

16.     The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to *Forbes*, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[9]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[10]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[11]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[12]

17.     The expansion of the subscription e-commerce market shows no signs of slowing.  "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their

---

[7] Blue Weave Consulting, *Global Toys and Games Market Growing Steadily: Projected to Grow at a CAGR of 5.7% during the forecast period (2021-2027)* (Jan. 27, 2022), https://www.globenewswire.com/en/news-release/2022/01/27/2374565/0/en/Global-Toys-and-Games-Market-Growing-Steadily-Projected-to-Grow-at-a-CAGR-of-5-7-during-the-forecast-period-2021-2027-BlueWeave.html.

[8] *See* Wall Street Journal, *Trendy Baby-Toy Maker Lovevery Gets $800 Million Valuation* (Oct. 28, 2021), https://www.wsj.com/articles/trendy-baby-toy-maker-lovevery-gets-800-million-valuation-11635418802.

[9] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[10] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[11] *Id.*

[12] *Id.*

---

promise of convenience and strong business continuity."[13]   According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[14]

18.   However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model.[15]   While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[16] In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[17]   Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[18]   As these companies have realized, "[t]he real money is in the inertia."[19]   As a result, "[m]any e-commerce sites work with third-party vendors to implement more

---

[13] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra*.

[14] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[15] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[16] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers*, (February 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking- inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[17] *Id.*

[18] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (April 7, 2014), *supra*.

[19] *Id.*

manipulative designs."[20]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans.  It does this by intentionally confusing users with their app's design and flow, … and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[21]

19.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[22]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[23]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts [and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[24] widespread utilization of these misleading dark patterns and deliberate omissions persist.

20.     Defendant has successfully implemented these tactics.  As noted above, just four years following its launch, Defendant achieved a valuation of more than $800 million in October 2021.[25]  By that time, Defendant "boast[ed] more than 220,000 active subscribers, and in the [prior] 12 months it shipped more than one million play kits, the company says."[26]  In particular,

---

[20] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (June 25, 2019), https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

[21] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (October 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[22] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra* ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[23] *Id.*

[24] *Id.*

[25] *See* Wall Street Journal, *Trendy Baby-Toy Maker Lovevery Gets $800 Million Valuation* (Oct. 28, 2021), *supra.*

[26] *Id.*

---

Defendant experienced tremendous growth "[d]uring the [COVID-19] pandemic, [at which point] subscription boxes gained immense popularity among kids and parents as they struggled to survive without school and childcare."[27]

## B.    Defendant's Dark Patterns And Online Consumer Complaints About The Lovevery Subscriptions

21.    Defendant's dominance over the United States play kit market is directly linked to its aggressive and deceptive marketing tactics.  Indeed, Defendant's recent growth in revenues and subscriber count with respect to its Lovevery Subscription coincides with a sharp decline in subscriber satisfaction, as the Lovevery Subscription and the Platform from which they operate have become riddled with "dark patterns."  A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[28]  Specifically, Defendant has been using various types of dark patterns, including but not limited to "roach motel,"[29] "misdirection,"[30] and "forced continuity,"[31] in order to prevent users from leaving the Lovevery Subscription by adopting complex cancellation procedures to increase the friction in the subscription cancellation process.  Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the terms of its automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their Lovevery Subscriptions.  It has further led to an increase

---

[27] Blue Weave Consulting, *Global Toys and Games Market Growing Steadily: Projected to Grow at a CAGR of 5.7% during the forecast period (2021-2027)* (Jan. 27, 2022), *supra*.

[28] UX Design, *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[29] "Roach motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[30] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another."  In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]"  https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[31] One example of "forced continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning.  [The subscriber is] are then not given an easy way to cancel the automatic renewal."  https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

---

in accidental or unintentional sign-ups by consumers for paid Lovevery Subscription plans, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.

22.     For instance, consumers have complained on social media outlets both about Defendant's misleading enrollment process as well as its confusing cancellation process. One recent consumer posted the following complaint on Reddit: "We signed up for 3 months initially and now I get them individually. Beware that if you don't cancel your 'subscription' they will just keep sending you the boxes without notifying you. I received a box I didn't want because I assumed they would notify you prior to charging/sending the box."[32]

23.     Indeed, Defendant's conduct has drawn the attention and ire of customers across the country, with countless angry customers taking to the Internet to voice their discontent over Defendant's broken promises. For instance, numerous subscribers have left scathing reviews on the Better Business Bureau website, complaining of the unclear billing practices and confusing cancellation policy associated with the Lovevery Subscriptions:[33]





Ann B
★★☆☆☆                                    01/25/2023

I feel disgusting by them auto subscribe me even after I chose the single month only, so when buying they do have multiple month and single month selection to choose to buy, and the multiple months has cheaper price, I chose single month, but suddenly I see in my email they order for me another month, I don't know where is the hidden button to tick off for subscription, but by logic, if you already give a single month and multiple month selection, shouldn't that mean that it's only a one time business? just feel bad on this experience......

Roy M
★☆☆☆☆                                    08/02/2022

This business has a very scammy type of subscription where it automatically signs people up for their product kit subscription, and leaves you with a long process to get your money back without any ability to cancel an order before it even ships to your house. I had ordered one of the Play Kits from the website for $80 and got automatically signed into their subscription without my knowledge. Maybe it was an error on my part, but when I got an email saying that the NEXT Play Kit had been shipped I got on customer support right away to cancel and stop them from charging me and pulling money from my account. Customer support gave me the run around by saying they had "switched shipping centers" and we couldn't cancel the order even though it hasn't been shipped yet. So now they want me to receive the product and then return it before they give me any refund back, which can take weeks all by itself. Very poor way of doing business and I would highly recommend anyone who gets products from this business to give it a second thought, or at least know what you're getting yourself into. They refused to give me any kind of refund or stop the processing of the package even though it hadn't **** shipped.. That's just wrong? I'm not sure what leaving a review on this website will do for their business but I wish anyone better luck then I've had with them. P.S: I just looked at everyone else's reviews and looks like I got duped as well. Sorry everyone, hopefully you all got your money back from "scamevry".

[32] https://www.reddit.com/r/BabyBumpsCanada/comments/whuitk/lovevery_subscription/.

[33] *See* https://www.bbb.org/us/id/boise/profile/online-retailer/lovevery-inc-1296-1000082436/customer-reviews/.



Stella N
⭐☆☆☆☆                                                    06/15/2022

This company is very quick in terms of getting your money. They also make you think that as a parent your input its very important and want you to participate to their product reviews which they will make you sign some legal papers and after that they never even follow up. Its just for a show. I paid for the entire year for my son and his second order was lost , I went back and forth with Lovevery and*** and I could not get a hold of anyone nor I got any reply. This company claims that their product are safe but my 5 month old hurt himself as their product are heavy and wood base. For example their tissue Box its unsafe . Really disappointed

Brian D
⭐☆☆☆☆                                                    02/07/2022

I cancelled my subscription for the playkits mid 2021 and I keep getting charged for new items. I had 3 playkits charged to me after my original cancelled subscription. Each false order has to be reconfirmed that my account has been cancelled. This is a horrible business practice

24.     The above reviews are just a sampling of the widespread pattern of uniform unlawful conduct by Defendant, underscoring the artifice devised and employed by Defendant to lure and deceive thousands of consumers into enrolling, and remaining enrolled, in its paid Lovevery Subscription programs.

**C.     California's Automatic Renewal Law**

25.     In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq.*, with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third-party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Cal. Bus. & Prof. Code § 17600 (statement of legislative intent).  More recently, in 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online.

26.     The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1)  Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer.  If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the

trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

(2)   Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

(3)   Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.  If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

27.   Prior to the completion of the initial order for the automatic renewal or continuous service, sellers must also explain the price to be charged when the promotion or free trial ends.  *See* Cal. Bus. & Prof. Code § 17602(a)(1).  If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing.  *See id.*

28.   Section 17602(c) of the ARL further provides:

A business that makes an automatic renewal offer or continuous service offer shall provide a toll-free telephone number, electronic mail address, a postal address if the seller directly bills the consumer, or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c).

29.   Additionally following the 2018 and 2022 amendments to the ARL, the updated law requires e-commerce sellers, doing business in California, to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online.  Specifically, Section 17602(d) provides:

> [A] business that allows a consumer to accept an automatic renewal
> or continuous service offer online shall allow a consumer to
> terminate the automatic renewal or continuous service ***exclusively***
> ***online*, *at will*, *and without engaging any further steps that***
> ***obstruct or delay the consumer's ability to terminate the automatic***
> ***renewal or continuous service immediately.***

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

30.　　The updated ARL also requires a seller who provides an automatic offer that includes a free gift, trial, or promotional pricing to notify consumers about how to cancel the auto-renewal before they are charged.  *See* Cal. Bus. & Prof. Code § 17602(a)(3).

31.　　Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term."  Cal. Bus. & Prof. Code § 17601(a).

32.　　Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures:  (1) That the subscription or purchasing agreement will continue until the consumer cancels.  (2) The description of the cancellation policy that applies to the offer.  (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known.  (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.  (5) The minimum purchase obligation, if any."  Cal. Bus. & Prof. Code § 17601(b).

33.　　Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."  Cal. Bus. & Prof. Code § 17601(c).

34.　　Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material

sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]"  Cal. Bus. & Prof. Code § 17603.

35.     As alleged below, Defendant's practices on the Lovevery Website systematically violate Sections 17602(a)(l), 17602(a)(2), 17602(a)(3), 17602(c), and 17602(d) of the ARL.

**D.     Defendant's Business: The Subscription  Enrollment Process**

36.     At all relevant times, Defendant offered, via the Lovevery Website, the Lovevery Subscription for access to exclusive Lovevery-branded content, products, and/or services on a contract or fee basis, including regular deliveries of Play Kit subscription boxes containing, among other things, educational toys, books, and games designed to meet the developmental needs and brain development of toddlers and babies from birth through age three, which are sent to subscribers every two to three months, as well as exclusive access to the Lovevery mobile application (the "Lovevery App"), a parenting app that accompanies the subscription, and the digital tools and products available thereon.[34]  Defendant offers these paid subscriptions on a recurring basis, and all plans automatically renew on a bimonthly or trimonthly basis unless the subscriber cancels their subscription three business days prior to the next weekly delivery.  For example, customers with a bimonthly Lovevery Subscription plan are, at the end of the initial two-month period, automatically renewed and typically charged the full amount for the next billing period, and every two months thereafter if they do not cancel.  Likewise, customers with a trimonthly Lovevery Subscription plan are, at the end of the initial three-month period, automatically renewed and typically charged the full amount for the next billing period, and every three months thereafter if they do not cancel.  Defendant also occasionally offers the Lovevery Subscriptions on a free trial or promotional basis for a limited period of time, in which case, at the end of the initial trial period, customers' subscriptions are converted to paid bimonthly or

---

[34] *See* Lovevery, *Frequently Asked Questions*, https://lovevery.com/pages/help (last accessed Feb. 16, 2023) ("Why is The Lovevery App only available to Play Kits subscribers?  Our app is available to our Play Kits subscribers because it's a natural complement to The Play Kits experience, including Digital Play Guides and video how-tos on ways to play with each Plaything.").

trimonthly subscriptions and their Payment Methods are automatically charged the full renewal rate associated with the subscription plan for the billing period, and every two or three months thereafter if they do not cancel.  Defendant's Lovevery Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Cal. Bus. & Prof. Code § 17601.

37.     Consumers can sign up for Defendant's Lovevery Subscription through the Lovevery Website.[35]  Customers who purchase a Lovevery Subscription via the Lovevery Website are automatically enrolled by Defendant in their chosen Lovevery Subscription program going forward, by default.  In addition, as noted above, customers may sign up for the Lovevery Subscription at a promotional rate or on a free-trial basis for a limited time.  Nevertheless, customers that enroll in a promotional or free trial, like those that sign up for a paid subscription, must provide Defendant their payment information at the time of enrollment.  Customers' trial subscriptions automatically convert to paid monthly subscriptions at the end of the trial period, at which point those users are also automatically enrolled by Defendant in their chosen Lovevery Subscription program, and as such their Payment Methods are automatically charged by Defendant on a recurring monthly basis in the amount of the full, promotional, or discounted rate associated with that program, continuing indefinitely until the customer takes affirmative steps to cancel.

38.     Whether a given consumer's Lovevery Subscription automatically renews every two months or every three months depends on the age of the subscriber's child at the time of enrollment and throughout the life of the consumer's Lovevery Subscription.[36]  For instance, if a subscriber enrolls when his or her child is a newborn, the subscriber will be enrolled in a *bimonthly* Lovevery Subscription and will receive a *Baby Play Kit every two months* for the first year of the consumer's

---

[35] *See id.* ("Lovevery products are only available online and can be purchased from https://lovevery.com[.]").

[36] *See id.* ("With a Lovevery Play Kits Subscription, The Play Kits are shipped on an ongoing basis until action is taken by the subscriber or the child ages out. … Baby Play Kits are designed for baby's first 12 months of life: the 'fourth trimester' (0 to 12 Weeks), and Months 3-4, 5-6, 7-8, 9-10 and 11-12. … Toddler Play Kits are designed for toddlers 13-48 months old and are shipped every quarter (every 3 months)."); *id.* ("Baby Play Kits ship every 2 months and Toddler Play Kits every 3 months[.] … We've packed more playthings into each Toddler Play Kit to keep your little one busy and engaged for 3 full months, versus the 2-month periods of each Baby Play Kit.").

enrollment, at a *renewal rate of $80 per play kit* (exclusive of taxes and fees).  Then, if the subscriber does not cancel, the consumer's paid Lovevery Subscription will automatically, and without notice, convert into a paid *trimonthly* Lovevery Subscription for the next three years of the consumer's enrollment, pursuant to which the consumer will receive a *Toddler Play Kit every three months* at a *renewal rate of $120 per play kit* (exclusive of taxes and fees).[37]  Accordingly, at the time of enrollment, consumers do not themselves select the renewal term, renewal rate, or particular play kit (*e.g.*, Baby vs. Toddler) that will be associated with their Lovevery Subscriptions;[38] terms such as the length of renewal term and recurring price applicable to a consumer's Lovevery Subscription, as well as frequency of delivery and type of Play Kit, are determined by Defendant based on the age of the child as reported by the subscriber at the time of enrollment.[39]

39.     To sign up for one of Defendant's Lovevery Subscriptions, the consumer must first navigate to the product page of the Lovevery Website, select "Get Started," then proceed to build a Play Kits subscription by entering his or her child's birth date on the following page, which will

---

[37] *See supra* notes 1-2, 36; *see also* Lovevery, *Frequently Asked Questions*, *supra* ("We currently collect taxes when shipping to … California[.]").

[38] Currently, if a consumer enrolls in a Lovevery Subscription at the time of his or her child's birth (*i.e.*, 0 to 12 weeks) and cannot or does not subsequently cancel the Lovevery Subscription, it will continue to automatically renew and result in bimonthly and trimonthly charges to the consumer's Payment Method for a <u>minimum</u> of four years.  *See* Lovevery, *Frequently Asked Questions*, *supra* ("Subscriptions last until we no longer offer products for your child's age, or until you cancel."); *see also* Lovevery, *Terms of Service*, https://lovevery.com/pages/help#terms (last updated Feb. 23, 2022) ("THE LOVEVERY SUBSCRIPTION PRODUCT LINE MAY EXPAND TO INCLUDE OLDER AGES OVER TIME.").

[39] *See* Lovevery, *Frequently Asked Questions*, *supra* ("How does the Play Kit subscription work?  The Play Kit subscription program delivers stage-based play products directly to your door.  We've done the research to develop products that are right for your child's development stage by stage, accompanied by an in-depth Activity Guide that helps you learn right alongside your baby."); *see also id*. ("Why is my next Play Kit shipping so soon?  It can happen that the first 2 Play Kits ship closely together when a baby has almost aged into the next Play Kit at the time the subscription is started.  This is a result of stage-based recommendations.").

---

determine a personalized Play Kit schedule.[40]  The consumer must then select any add-on

subscription plans offered by Defendant[41] and input their shipping information / mailing address.

40.     After these steps, consumers are directed to the final webpage of the enrollment

process where prospective subscribers are prompted to input their billing information / Payment

Method details and then invited to complete their purchase (the "Checkout Page").  For the

purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the

text of that portion of the Checkout Page that appears "in visual proximity … to the request for

consent to the offer[,]" which in this case pertains to the block of text located immediately above

the final blue button at the bottom of the Checkout Page that customers must press in order to

complete the checkout process via the Lovevery Website.

41.     By way of example, at least as of February 2023, when a consumer signs up for a

Lovevery Subscription via his or her computer web browser, the "relevant portion of the Checkout

Page" refers to the disclosures in the block of text above the blue "Place Your Order" button (*i.e.*,

the "request for consent"), which contains the following language and appearance (red box added

for emphasis):

---

[40] *See* Lovevery Product Page, https://lovevery.com/products/the-play-kits ("How it Works ... [Step 1:] **Start at the Right Stage**[.]  Enter your child's birth date/adjusted birth date for your personalized Play Kit schedule, and activate your subscription."); Lovevery, *Frequently Asked Questions*, *supra* ("How do I place an order? Navigate to the product page.  Click the 'add to cart' button to add the Play Kits, … and proceed through checkout.").  *See also* https://lovevery.com/pages/subscription/child-info; https://lovevery.com/pages/subscription/starting-kit.

[41] For instance, Defendant offers a "Book Bundle Add-On," such as the "Looker Play Kit Book Bundle" for children weeks 0-12, which automatically renews indefinitely along with the subscriber's base Lovevery Subscription and ships with each Play Kit at an additional cost of $18 per Kit.  The Book Bundle is otherwise subject to the same terms concerning billing practices, length of renewal term, and cancellation policy as the consumer's underlying base Lovevery Subscription.

---



42.     Regardless of how the consumer subscribes (via the Lovevery Website on its mobile or desktop format), and irrespective of which particular Lovevery Subscription plan in which the consumer is enrolled (which is based on their child's birthdate at the time of enrollment and throughout the life of the consumer's Lovevery Subscription), Defendant fails to disclose the full terms of its auto-renewal program either before or after checkout, and it never requires the individual to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the

1   checkout process and submit their orders for Defendant's Lovevery Subscriptions.  Consequently,

2   Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to

3   – its subscribers before charging consumers' Payment Methods on a recurring basis.

4         **E.   Defendant Violates California's Automatic Renewal Law**

5         43.   At all relevant times, Defendant failed to comply with the ARL in at least three core

6   ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous

7   manner and in visual proximity to the request for consent to the offer before the subscription or

8   purchasing agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii)

9   Defendant charged Plaintiff's and the proposed class members' Payment Methods without first

10  obtaining their affirmative consent to the agreement containing the automatic renewal offer terms,

11  in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an

12  acknowledgment that included the automatic renewal offer terms, cancellation policy, and

13  information regarding how to cancel in a manner that is capable of being retained by the consumer,

14  in violation of Cal. Bus. & Prof. Code § 17602(a)(3).  Defendant also fails to provide an

15  acknowledgment that discloses a toll-free telephone number or describes another cost-effective,

16  timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly

17  difficult and unnecessarily confusing for consumers to cancel their Lovevery Subscriptions, in

18  violation of Cal. Bus. & Prof. Code §§ 17602(c) and 17602(d).

19         **1.   Defendant Fails To Clearly And Conspicuously Present The Lovevery**
20         **Subscription Terms Before The Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

21         44.   First, the Checkout Page for the Bespoke Post Subscription does not present the

22  complete "automatic renewal offer terms[,]" as defined by Cal. Bus. & Prof. Code § 17601(b), in

23  violation of Section 17602(a)(1) of the ARL.  Specifically, using the pictured Checkout Page above

24  as an example, the Checkout Page does not clearly and conspicuously disclose that "the

25  subscription or purchasing agreement will continue until the consumer cancels."  Cal. Bus. & Prof.

26  Code § 17601(b)(1).  For instance, although the relevant portion of the pictured Checkout Page

27  references – albeit vaguely (which is to say, not "clearly" within the meaning of Cal. Bus. & Prof.

28  Code § 17601(c)) – the "automatic continuation of [the consumer's] Play Kit subscription until [he

or she] cancel[s,]" *see supra*, this information is presented in basic, unbolded black type without emphasis or distinction, and it is provided in text of the same type, font, and color, but of *smaller* size, as most other text of the Checkout Page.  The other text of the Checkout Page is significantly larger and, in effect, more visually prominent than any disclosures contained in this block of text above the blue "Place Your Order" button, which renders this tiny text in the relevant portion of the Checkout Page considerably less conspicuous by comparison and ultimately distracts the eye away from such small text and towards the larger text featured on the majority of the Checkout Page.[42] Further, the disclosure in the relevant portion of the Checkout Page is presented alongside – and thus, rendered even more inconspicuous by – other, unrelated disclosures of the same font type, size, and color featured within the same block of text providing information not required by the ARL.  Nor is it presented in contrasting font or color to the immediately surrounding text, and it is not set off from any other text of the Checkout Page by symbols, marks, graphics, or any other distinguishing factors that clearly call attention to the language.  In other words, the disclosure was presented in such a way that it could be, and was, easily overlooked, and is therefore not "clear and conspicuous" as defined by the ARL, *see id*. § 17601(c).  As such, with respect to the Lovevery Subscription, Defendant fails to disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels," *id*. § 17601(b)(1), in the manner required by statute.  *See id*. § 17602(a)(1).

45.     Defendant also fails to present a complete "description of the cancellation policy that applies to the offer[,]" *see* Cal. Bus. & Prof. Code § 17601(b)(2).  For instance, although the relevant portion of the pictured Checkout Page notes that cancellation "must be processed at least

---

[42] Based on these features, it is clear the so-called disclosure regarding the automatic renewal feature of the Lovevery Subscriptions is buried in the tiny, fine print at the bottom of the Checkout Page, and that it is therefore exactly the type of deceptive practice the California Legislature sought to deter and penalize when it enacted the ARL.  *See Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1140 n.6 (S.D. Cal. 2021) ("Notably, the practice that led to ARL was the inclusion of autorenewal terms in fine print."); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print.  Because 'online providers have complete control over the design of their websites,' 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.") (internal citations omitted).

three business days prior to [the consumer's] next shipment" and that, generally, subscribers "may cancel [their] subscription by updating [their] account settings or by contacting Lovevery support," these statements are presented in the same block of tiny text at the bottom of the Checkout Page as the disclosure discussed in the paragraph above.  Thus, these statements, which suffer from the same deficiencies as noted above in that they are also buried in the fine print of the Checkout Page and are likewise easily overlooked, are not "clear and conspicuous" as defined by the ARL.

46.     Further, neither of the statements discussed above concerning cancellation constitutes a fulsome or clear description of Defendant's cancellation policy.  Indeed, other webpages of the Lovevery Website beyond the Checkout Page – none of which are shown to subscribers during the enrollment process – are much clearer about the existence of a cancellation deadline and the consequences of failing to cancel the Lovevery Subscriptions in advance of that deadline.[43]  Moreover, even if it could be said that the Checkout Page *does* adequately disclose this requirement to cancel 3 business days before the next shipment (and it does not), the information provided on the Checkout Page is still insufficient for the consumer to determine precisely when the next shipment will be, and thus *when* cancellation must occur in order to avoid incurring further automatic charges for the subsequent renewal period(s).  For instance, the Checkout Page does not explain or allude to the fact that renewal, billing, and shipment – and thus, the cancellation deadline – are all tied to the subscriber's child's birthdate as reported by the subscriber at the time of initial enrollment, as is set forth on other pages of Defendant's website.[44]  Yet, this information is necessary for consumers for consumers to successfully affect cancellation and avoid continued

---

[43] *Compare* Checkout Page, *supra* (noting "the automatic continuation of your Play Kit subscription until you cancel (<u>which must be processed at least three business days prior to your next shipment</u>)") (emphasis added), *with* Lovevery, *Terms of Service*, https://lovevery.com/pages/help#terms (last updated Feb. 23, 2022) ("[Y]ou may cancel your automatic Subscription renewal through the Account page on the Website.  You must update your Account on the Website at least 3 business days prior to your next shipment. … **IF YOU DO NOT CANCEL YOUR SUBSCRIPTION AT LEAST 3 BUSINESS DAYS PRIOR TO YOUR NEXT SHIPMENT, YOUR SUBSCRIPTION WILL AUTOMATICALLY RENEW FOR THE NEXT APPLICABLE PERIOD.**") (emphasis in original).

[44] *See* Lovevery, *Frequently Asked Questions*, *supra* ("When will my Play Kits ship? … Your Play Kit will ship on a delivery schedule based on the birthdate entered at the time you subscribe."); *see also id.* ("When do you charge my credit card?  Pay-as-you-go subscriptions will charge your card when each Play Kit ships.").

renewal charges for subsequent billing periods.  Moreover, the disclosure was particularly

important here given the counterintuitive nature of that policy.  That is, in the case of the majority

of other subscription boxes and automatic renewal programs offered by other retailers, the

shipment / renewal / billing date is tied to the passage of a fixed and precise duration following the

date of initial enrollment, such as every 30 days following sign up, or the recurrence of the same

monthly calendar date (*e.g.*, where a consumer enrolled on January 3, renewal may occur the third

of every subsequent month).  Accordingly, in the absence of a clear and conspicuous disclosure on

the Checkout Page explaining that the renewal date and cancellation deadline here are both

counterintuitively tied to the child's birthdate rather than enrollment date, there is a heightened and

particular threat that consumers enrolling in the Lovevery Subscriptions would reasonably – but

falsely – assume that Defendant's automatic renewal program would operate consistently with

most other automatic renewal programs in this regard.  That is, the unconventional nature of

Defendant's policies creates an especially high risk of consumer confusion, and, in turn, financial

injury in the fact of hidden, inadequate, and/or missing disclosures.  Similarly, the Checkout Page's

inconspicuous statement in the fine print regarding how to cancel is insufficient because it is

largely uninformative—and, in practice, patently unhelpful.  Indeed, comparison between the

Checkout Page disclosures and the clearer, more fulsome explanations provided elsewhere on the

Lovevery Website, further highlights these so-called disclosures' inadequacy.[45]

47.     In addition to the unclear and/or inconspicuous cancellation terms discussed above,

the Checkout Page also fails to adequately disclose the applicable cancellation policy in that it

entirely omits several material aspects of that policy as required by the ARL.  *See* Cal. Bus. & Prof.

Code §§ 17602(a)(1), 17601(b)(2).  For instance, Defendant does not specify anywhere on the

Checkout Page that, consumers have the "right to withdraw the purchase of the Product during a

30-day reflection period," and nor does it provide any of the details or requirements for utilizing

---

[45] *Compare* Checkout Page, *supra* ("You may cancel your subscription by updating your account settings or by contacting Lovevery support."), *with* Lovevery, *Frequently Asked Questions*, *supra* ("How do I manage or cancel my subscription?  **Please log into your customer account and click on 'Account Settings'.  Then under 'Manage Subscription', you can skip the next Play Kit or cancel your subscription**.  You are able to stop shipment up to 3 business days prior to the next shipment date using this functionality.") (emphasis added).

that right and thereby cancelling the Lovevery Subscription while preserving the right to a refund.[46]

Nor does it disclose the consequences of cancellation, including that the consumer "will [] lose

access to The Lovevery App"[47] and that consumers who "cancel a paid up-front subscription[] …

---

[46] The full relevant terms of Defendant's "Right of Withdrawal/Return" policy are as follows:

> Returns.  If for any reason you are not satisfied with your Product purchased through our Website, … you have the right to withdraw the purchase of the Product during a 30-day reflection period (the "Reflection Period"), provided that you must subsequently return or hand over the Product to us (at the address provided below) within 30 days from the date on which you inform us that you are exercising your right of withdrawal (collectively, the "Right of Withdrawal/Return").  You have the risk and the burden of proof for the correct and timely exercise of the Right of Withdrawal/Return.  In order to comply with the Reflection Period, it is sufficient that you send the notification about the exercise of your Right of Withdrawal/Return before the end of the Reflection Period. … The Reflection Period starts on the day after you, or a third party designated in advance by you, who is not the carrier, have received the Product, or[] … in the case of a Subscription: the day on which you, or a third party designated by you, received the first Product.
> During the Reflection Period, you have to handle the Product and its packaging with care.  You will only unpack or use the Product to the extent necessary to determine the nature, characteristics and operation of the Product.  You may only handle and inspect the Product as you would be allowed to do in a store. If you do not handle the Product accordingly, you are liable for any depreciation of the Product.
> If you use your Right of Withdrawal/Return, you must return or hand over the Product(s) as soon as reasonably practicable and in any case no greater than 30 days from the date on which you informed us that you are exercising your Right of Withdrawal/Return with respect to the Product.  You must return the Product with all accessories supplied, if reasonably possible in the original condition and packaging, and in accordance with reasonable and clear instructions by us.  Return shipping is free of charge for customers located in the United States or Canada.
> If you withdraw/return a Product in accordance with the foregoing requirements, we shall reimburse you for all payments we have received from you, including delivery costs (with the exception of additional costs resulting from the fact that you have chosen a different type of delivery than the cheapest standard delivery offered by us), immediately and at the latest within 14 days from the day the delivery is received at our warehouse. … **To exercise your Right of Withdrawal/Return or if you have any questions, please contact Lovevery customer support. Please include in your message: your name, order number, and, optionally, the reason for the return. Please keep all original packaging**.

Lovevery, *Terms of Service*, *supra* (underlining denotes hyperlink; emphasis in original).  Further, the "Lovevery customer support" link on the *Terms of Service* page as quoted above leads to another webpage of the Lovevery Website where consumers are invited to "submit a request" through an inquiry/contact form with various pre-filled drop-down menu options, such as "I need to change, cancel or return my order" and "I want to cancel my subscription."  *See* https://help.lovevery.com/hc/en-us/requests/new (last accessed Feb. 23, 2023).  Like the Right of Withdrawal/Return policy, the process of cancelling through this inquiry form was not explained on the Checkout Page.

[47] Lovevery, *Frequently Asked Questions*, *supra* ("What happens if I cancel my Play Kits subscription?  If you cancel your Play Kits subscription, you will also lose access to The Lovevery App."); *see also id.* ("Why is The Lovevery App only available to Play Kits subscribers?  Our app is available to our Play Kits subscribers because it's a natural complement to The Play Kits

---

will forfeit any prepaid discount,"[48] as are set forth on other pages of Defendant's website.  The

Checkout Page also fails to mention that cancellation can *only* be affected on the Lovevery

Website, and more specifically that cancellation is not possible through the Lovevery App, as do

terms set forth on other pages of Defendant's website.[49]  Nor does the Checkout Page provide any

contact method that the consumer can use to reach out and affect cancellation, such as a toll-free

phone number or an email address.[50]  These undisclosed terms constitute material aspects of

Defendant's cancellation policy.

48.     As a result of the inadequate disclosures and/or outright omissions on the Checkout

Page, Plaintiff was not previously aware of the above aspects of Defendant's cancellation policy.

At no point during the life of her Lovevery Subscription was Plaintiff required or even prompted to

navigate to or otherwise examine any of the terms disclosed on the on any other page of the

Lovevery Website aside from the Checkout Page.  Yet, prior to checkout, Defendant was obligated

by law to place consumers on notice of these aspects of Defendant's cancellation policy in

accordance with the ARL, which requires that companies provide such information "in visual

proximity to the request for consent to the [automatic renewal] offer."  Cal. Bus. & Prof. Code §

17602(a)(1); *see also id*. § 17601(b)(2).  It is not enough that the cancellation policy may be set

forth on the hyperlinked pages located elsewhere on the Lovevery Website; the ARL requires that

Defendant present its full cancellation policy directly on the Checkout Page – and it must further

do so "clearly and conspicuously," *id*. § 17601(c), and with the requisite proximity (*i.e.*, they must

appear in the block of text immediately above the "Place Your Order" button on the bottom of that

page), *see id*. § 17602(a)(1) – so as to allow the consumer to read and review the applicable offer

---

experience, including Digital Play Guides and video how-tos on ways to play with each
Plaything.").

[48] *See id*. ("If you cancel a paid up-front subscription, you will … forfeit any prepaid discount.").

[49] *See* Lovevery, *Terms of Service*, *supra* ("SUBSCRIPTION CANCELLATIONS … [Y]ou may
cancel your automatic Subscription renewal through the Account page on the Website.  You must
update your Account on the Website at least 3 business days prior to your next shipment.")
(emphasis added).

[50] *Cf*. Lovevery, *Frequently Asked Questions*, *supra* note 46; Lovevery, *Terms of Service*, *supra*
note 47; "Lovevery Customer Support," *supra* note 47.

terms immediately prior to purchase.  However, Defendant failed, and continues to fail, to satisfy

that requirement, in violation of Section 17602(a)(1) of the ARL.

49.     Additionally, the Checkout Page for the Lovevery Subscription does not adequately

disclose the recurring amount to be charged to the subscriber's Payment Method each billing

period.  Although there is an indication as to associated costs obscurely provided in the "Order

Summary" portion at the top right corner of the Checkout Page—at a significant distance from the

"Place Your Order" button on that page—that is not the portion of the Checkout Page with which

the ARL is concerned.  By contrast, the relevant portion of the Checkout Page (*i.e.*, the portion in

"visual proximity" to the request for consent, *see supra*) is utterly silent as to the recurring amounts

to be charged following initial enrollment.  In fact, no price term whatsoever appears in visual

proximity to the blue "Place Your Order" button near the bottom of the webpage (*i.e.*, the request

for consent featured on the Checkout Page).  And even if the dollar figures provided in the top right

corner of the Checkout Page were sufficiently proximate the checkout button to satisfy the ARL

(they are not), they still fail to place subscribers on notice of the amount that will be charged to

their Payment Methods each billing period, for two reasons.  First, although the "Order Summary"

text box indicates that the "Play Kit Subscription Program" has a "Pay per Kit" cost of "80.00,"

and that the consumer is being charged a "Subtotal" of "$80.00," "Taxes" in the amount of

"$6.70," and a "Total" of "$86.70," the "Pay per Kit" language is overshadowed by the larger price

breakdown and "Total" charge amount stated underneath: both of which are written in a larger font

(*i.e.*, 10.5 point-font vs 12 point-font).  As such, the Checkout Page gives consumers the

impression that they are only purchasing a single play kit that they can decide to purchase again or

decline in the future, rather than enrolling in a continuous subscription at an undisclosed price.

And where, as here, it turns out that the purchase at issue *is* a continuous subscription purchase that

will result in recurring automatic charges, the Checkout Page is still unclear as to whether the

different "Subtotal" and "Total" amounts listed in the "Order Summary" text box pertain solely to

the consumer's initial purchase and reflect the amount that will be withdrawn from that person's

Payment Method on that day alone, or whether the same or different rates will also apply to the

subsequent charges to be withdrawn from the consumer's Payment Method upon renewal.  In other

words, the Checkout Page does not specify whether the dollar figures of presented thereon apply to "today's total," or whether the consumer can expect to be charged the same amount every time another Play Kit ships—and if so, what that amount will be between the subtotal amount of $80.00, the total amount of $86.70, or a different amount altogether.  Finally, and perhaps most problematically, the Checkout Page does not even hint at the fact that the price per Play Kit will automatically change from $80 to $120 once the subscriber's child ages out of the Baby Play Kits and begins receiving Toddler Play Kits.[51]  If the subscriber enrolls when his or her child is a newborn, the price change will happen approximately twelve months after enrollment, but the timeline of a subscriber's conversion from Baby Play Kit to Toddler Play Kit (and, correspondingly, this per Kit price increase) varies depending on the age reported by the subscriber at the point of enrollment.  If the subscriber will be charged $86.70 every time the Play Kit ships, the Checkout Page should say so plainly and in conspicuous lettering appearing immediately above the "Place Your Order" button and immediately next to a checkbox affirming that the consumer understands and agrees to that price.  If that price will change to $120 per Kit plus tax when the subscriber's child ages out of the Baby Play Kits, then Defendant should also plainly state, in the same portion of the Checkout Page as the initial recurring price and in equally conspicuous lettering, the precise amount to which the renewal rate will change (including tax) and the exact calendar date that this change will take place.  That is what the ARL requires.  Indeed, Plaintiff ended up paying **50% more** ($128.70) for her second recurring charge than her first initial charge of $85.80, which she had not expected based on the conspicuous disclosures of the Checkout Page.  Thus, with respect to the Lovevery Subscription, Defendant fails to provide notice of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known[,]" Cal. Bus. & Prof. Code § 17601(b)(3), in violation of Section 17602(a)(1) of the ARL.

---

[51] *See supra* notes 39-41.

50.     Finally, the Checkout Page fails to disclose the length of the automatic renewal term associated with the Lovevery Subscription, *see* Cal. Bus. & Prof. Code §§ 17601(b)(4), 17602(a)(1).  Indeed, there is no indication whatsoever on the exemplar Checkout Page shown above that the Baby Play Kit is shipped to subscribers and results in automatic charges to their Payment Methods every two months or that the Toddler Play Kit is shipped to subscribers and results in automatic charges to their Payment Methods every three months, nor does it explain whether the subscriber will receive a Baby Play Kit or Toddler Play Kit upon first renewal and/or subsequent renewals after that—a fact that will determine the applicable renewal period.  In the same vein, it also fails to explain that, even if a subscriber receives the Baby Play Kit to start, at some point (i.e., once the subscriber's child ages out of the Baby Play Kits), the subscriber's Baby Play Kit Subscription will be automatically converted to a Toddler Play Kit Subscription, at which time the length of the applicable renewal period will automatically and without notice change (along with the recurring price to be charged, *see supra*) from two months to three months. Further, as noted above, consumers must cancel the Lovevery Subscription at least three business days prior to renewal/shipment in order to avoid being charged for the subsequent billing period. Accordingly, this information is not only necessary for consumers to be placed on notice of "[t]he length of the automatic renewal term" as per Cal. Bus. & Prof. Code § 17601(b)(4), but also for consumers to determine the applicable cancellation deadline and thus to be placed on notice of "the cancellation policy that applies to the offer" as per Cal. Bus. & Prof. Code § 17601(b)(2). Accordingly, a reasonable consumer would find the statements of the Checkout Page unclear with regards to the length of the applicable automatic renewal terms, as well as when formal cancellation is required in order to stop Defendant from automatically charging renewal fees to customers' Payment Methods on a recurring basis.  If consumers are not on notice of the precise date that their Lovevery Subscriptions will renew and their Payment Methods will be charged each month or billing period, they cannot, as a practical matter, affect cancellation before that date.  As such, Defendant fails to disclose "[t]he length of the automatic renewal term or that the service is continuous," Cal. Bus. & Prof. Code § 17601(b)(4), in further violation of Section 17602(a)(1) of the ARL.

51.     As a result of Defendant's missing and otherwise deficient pre-purchase disclosures, when Plaintiff selected and enrolled in her automatic renewal program for a Lovevery Subscription, she was unaware that Defendant had enrolled her in an "automatic renewal" program under which her subscription would renew each month and result in continuous monthly automatic renewal charges to her Payment Method unless and until she successfully canceled the subscription.

**2.     Defendant Fails To Obtain Consumers' Affirmative Consent To The Undisclosed Automatic Renewal Terms Associated With The Lovevery Subscriptions.**

52.     Second, Defendant does not at any point during the checkout process require consumers to read or affirmatively agree to any terms of service associated with their Lovevery Subscriptions, *e.g.*, by requiring consumers to select or click a "checkbox" immediately next to clear, conspicuous, and complete disclosures of the required automatic renewal offer terms before completing the checkout process.  Accordingly, when Defendant automatically renews customers' Lovevery Subscriptions, Defendant charges consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2).

53.     Although the Checkout Page does contain a checkbox that consumers *can* (but are not required to) click alongside a textual notice that reads, "Send me stage-based developmental content, new product launches, special promotions, and more[,]" this box is insufficient to confer affirmative consent because, as consent decrees obtained through ARL enforcement actions in California demonstrate, affirmative consent mechanism must be "[i]mmediately adjacent to the … AUTOMATIC RENEWAL OFFER TERMS … disclosed" on the Checkout Page and in visual proximity to the request for consent at the bottom of that page.  *See People v. Guthy-Renker LLC*, No. 19-cv-341980, at *5 (Cal. Super. Ct. Feb. 1, 2019).[52]  Further, the "check-box, signature, express consent button, or other substantially similar mechanism [for obtaining affirmative consent] … cannot relate to consent for anything other than the AUTOMATIC RENEWAL

---

[52] *Available at* https://www.law360.com/articles/1125326/attachments/0.

OFFER TERMS (such as final payment or completion of the transaction)." *Id.*; *see also People v. Beachbody, LLC*, No. 55029222, at *5 (Cal. Super. Ct. Aug. 24, 2017) (same); *People v. eHarmony, Inc.*, No. 17-cv-03314, at *4 (Cal. Super. Ct. Jan. 8, 2018) (same).  And here, the checkbox is not immediately adjacent to the complete automatic renewal terms required to be disclosed.  Moreover, based on the textual notice that *is* immediately adjacent to the checkbox, it clearly has nothing to do with any automatic renewal terms that may be disclosed on the Checkout Page or any other page of the Lovevery Website.  Rather, as the textual notice plainly states, the checkbox pertains strictly to marketing materials (*i.e.*, "stage-based developmental content, new product launches, special promotions").[53]  Thus, the consent mechanism "relate[s] to consent for [terms] <u>other than</u> the AUTOMATIC RENEWAL OFFER TERMS[, including] final payment or completion of the transaction[.]"  *See Guthy-Renker*, No. 19-cv-341980, at *5, *supra*.  As a result, the checkbox of the Checkout Page fails to confer affirmative consent, and the Checkout Page does not contain any other "check-box, signature, express consent button, or other substantially similar mechanism" capable of conferring affirmative consent as required by the ARL and detailed herein. *See id*.  Further, there is no requirement that consumers must keep this box checked before clicking the "Place Your Order" button; to the contrary, the checkbox is optional, and it is entirely feasible to complete the checkout process with the checkbox unchecked.[54]  Thus, the checkbox on the Checkout Page here is insufficient to constitute affirmative consent to the required automatic renewal terms that appear on a separate webpage of the Lovevery Website, as detailed above.[55]

[53] In addition, the textual notice is presented in larger font than the auto-renewal disclosures below, which not only renders such disclosures even more inconspicuous by comparison but also further highlights that the checkbox belongs to the textual notice next to it, has nothing to do with the auto-renewal disclosures below it, and is incapable of conferring the subscriber's affirmative consent to anything other the transmission of marketing and promotional materials.

[54] In any case, even a "checkbox" that consumers must affirmatively click in order to complete the subscription process would be insufficient to constitute affirmative consent to terms that appear on a separate page.  *See, e.g.*, *Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1099 (S.D. Cal. 2018) ("Defendant points to no language on its webpages indicating that by clicking a button on its webpage, the consumer is indicating that he or she has read *and* agrees to the Terms & Conditions.").

[55] This is true even if a hyperlink leading to that separate webpage is included on the Checkout Page.  *See Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1139-40 (S.D. Cal. 2021) (ARL case) ("Defendant … argues the required terms were accessible through a hyperlink that was a few centimeters from the request for consent.  But the terms themselves—not the access point to them—need to be in visual proximity to the request.") (emphasis added); *see also B.D. v. Blizzard*

54.     Accordingly, when Defendant automatically renews customers' Lovevery Subscriptions, Defendant charges consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, "including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time," in violation of Cal. Bus. & Prof. Code § 17602(a)(2).

**3.      Defendant Fails To Provide A Post-Checkout Acknowledgment That Clearly And Conspicuously Discloses The Required Lovevery Subscription Offer Terms.**

55.     Finally, after Plaintiff and the proposed class members subscribed to one of Defendant's Lovevery Subscription plans, Defendant sent email follow-ups regarding their purchases (the "Acknowledgment Emails").

56.     By way of example, at least as of 2023, the subject line of the email stated: "Amazing! You just subscribed to The Play Kits by Lovevery."  The body of the email contained, in relevant part, the following text and images:

---

*Ent., Inc.*, 76 Cal. App. 5th 931, 948 (2022) ("[T]he Sellers court found that in the context of a transaction governed by the ARL, the sign-in wrap notices 'were not sufficiently conspicuous to bind' the plaintiffs because the notices were 'significantly less conspicuous than the statutory notice requirements governing [the plaintiffs'] underlying [ARL] claims.'") (citations omitted).



57.     As the above image makes clear, the Acknowledgment Email, like the corresponding Checkout Page, does not clearly and conspicuously disclose the continuous nature of the subscription or purchasing agreement, the complete cancellation policy, the recurring amount to be charged (and that the amount will change, if applicable, and to what), or the length of applicable automatic renewal term.  Namely, the Acknowledgment Email does not provide: that the subscription "will continue until the consumer cancels[,]" Cal. Bus. & Prof. Code § 17601(b)(1); a

1   "description of the cancellation policy that applies to the offer[,]" Cal. Bus. & Prof. Code §

2   17601(b)(2); a statement of "[t]he recurring charges that will be charged to the consumer's

3   [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the

4   charge may change, [and] if that is the case, and the amount to which the charge will change, Cal.

5   Bus. & Prof. Code § 17601(b)(3); or "[t]he length of the automatic renewal term or that the service

6   is continuous, unless the length of the term is chosen by the consumer[,]" Cal. Bus. & Prof. Code §

7   17601(b)(4).  Disclosures of these required automatic renewal terms are either missing altogether,

8   are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in the tiny

9   fine print at the bottom of the email.  As such, the Acknowledgment Email fails to "include[] the

10   automatic renewal offer terms … and information regarding how to cancel in a manner that is

11   capable of being retained by the consumer[,]" in violation Cal. Bus. & Prof. Code § 17602(a)(3),

12   and it does nothing to remedy the missing information on the relevant portion of the Checkout

13   Page, discussed above.

14                                              * * *

15        58.     In sum, Defendant's deficient pre- and post-purchase disclosures and lack of

16   affirmative consent fail to comply with the ARL.  By and through these actions, Defendant has

17   charged Plaintiff's and Class members' Payment Methods in direct violation of the ARL.  As a

18   result, all goods, wares, merchandise, and/or products sent to Plaintiff and the Class upon the

19   automatic renewal of their continuous service agreements are deemed to be "unconditional gifts"

20   pursuant to Cal. Bus. & Prof. Code § 17603.

21        59.     Because Defendant failed to disclose this material information in the manner

22   required by statute, Plaintiff was unable at the point of sale to accept or provide affirmative consent

23   to Defendant's offer or knowingly enter into to the purchase agreements.  Thus, as a direct result of

24   Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout Page and in

25   the nonexistent Acknowledgment Email, Plaintiff was induced to sign up for, unable to terminate,

26   and automatically charged for her Lovevery Subscription.

27        60.     Further, even if Defendant *had* provided an Acknowledgment Email that describes

28   the cancellation mechanism as required (it does not), the "mechanism for cancellation" of the

Lovevery Subscriptions is not one that Plaintiff or reasonable consumers would consider "timely" or "easy-to-use" as the ARL requires. *See* Cal. Bus. & Prof. Code § 17602(c). As a direct result of Defendant's non-compliant cancellation mechanism, Plaintiff and putative Class Members have incurred substantial financial injury.

61. As a direct result of Defendant's unlawful conduct described above, Plaintiff suffered economic injury. Specifically, Defendant's ARL violations concerning the Lovevery Subscriptions caused Plaintiff's financial injury because she reasonably relied on Defendant's conspicuous disclosures of the Checkout Pages and the Acknowledgment Emails (and, as a natural corollary, the omissions and/or the inconspicuousness of the disclosures contained therein) in deciding whether to purchase her Lovevery Subscriptions in the first place and whether to continue paying for it upon after that (*i.e.*, by not cancelling the auto-renewal).

62. Had Defendant complied with the ARL by adequately disclosing – and obtaining Plaintiff's affirmative consent to – the requisite Lovevery Subscription terms on the Checkout Pages at the point of Plaintiff's initial enrollment, Plaintiff would have been able to read and review the auto renewal terms prior to purchase and she would have not enrolled in the Lovevery Subscription in the first place, or would have subscribed on materially different terms, thereby avoiding financial injury of any kind as a result of Defendant's ARL violations. Similarly, had Defendant complied with the ARL by adequately disclosing the terms associated with her Lovevery Subscription in the post-checkout Acknowledgment Emails (*i.e.*, after Plaintiff's initial enrollment in the Lovevery Subscription, but before any subsequent automatic renewal charge of her Payment Method), Plaintiff would have been able to read and review the auto renewal terms prior to another automatic renewal, and she would have cancelled her Lovevery Subscription prior to the expiration of the subscription period in which she learned such information, thereby avoiding all or part of the aggregate automatic renewal charges Plaintiff incurred in connection with her Lovevery Subscription. But Defendant did not adequately disclose the required automatic renewal terms in either the Checkout Page or the Acknowledgment Email, thereby depriving Plaintiff of the opportunity to make informed decisions as to the recurring transactions.

63.     The facts giving rise to Plaintiff's claims are materially the same as the Class she seeks to represent.

64.     Accordingly, Plaintiff brings this action individually and on behalf of similarly situated individuals against Defendant for violations of California's consumer protections statutes, including California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200.  As set forth in detail below, Plaintiff's claims, which are based on Defendant's failure to comply with the ARL, arise under the "unlawful" prong of the UCL.  Further, because the Lovevery Subscription was, by operation of law, "unconditional gifts" to Plaintiff and putative Class Members (*see* Cal. Bus. & Prof. Code § 17603) – and thus, Plaintiff and Class Members already owned the goods, tools, and benefits of the subscriptions as their personal property at the time Defendant withdrew monies from their Payment Methods as consideration for access to the same, without any legal or contractual authority to do so – Plaintiff's claims, which are also based on Defendant's practice of charging consumers in exchange for unconditional gifts, also arise under the "fraudulent" and "unfair" prongs of the UCL.  Additionally, Plaintiff brings this action against Defendant for violations of the CLRA and FAL, and for conversion, unjust enrichment, negligent misrepresentation, and fraud.

## CLASS ALLEGATIONS

65.     ***Class Definition***: Plaintiff brings this action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's Lovevery Subscription offerings.

66.     Specifically excluded from the Class are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

67.     Plaintiff reserves the right to amend the definitions of this Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

68.     ***Numerosity.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least tens of thousands of consumers throughout California.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

69.     ***Commonality and Predominance.***  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's Lovevery Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and Class members' Payment Method for an automatic renewal service without first obtaining their affirmative consent to the automatic renewal offer terms in violation of Cal. Bus. & Prof. Code§ 17602(a)(2); (d) whether Defendant failed to provide an acknowledgement that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*., California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*., and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the

misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees and costs  under California Code of Civil Procedure § 1021.5.

70.    ***Typicality.***  The claims of Plaintiff are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class's affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the Lovevery Subscriptions before charging their Payment Methods.

71.    ***Adequacy.***  Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer protection cases.

72.    ***Superiority.***  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, inter alia, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

73.    Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

74.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and the Class and will likely retain the benefits of its wrongdoing.

75.    Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

<u>**COUNT I**</u>
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq***

76.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

77.    Plaintiff brings this claim individually and on behalf of the members of the

proposed Class against Defendant.

78.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]"  Cal. Bus. & Prof. Code § 17200.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

79.     As alleged in more detail below, Defendant's acts and practices alleged herein are "unlawful" within the meaning of the UCL because it violated various laws, regulations, and rules, including the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq.*, as well as the CLRA, FAL, and all other consumer protection statutes and common laws as asserted in Counts II through V below.

80.     Additionally, at all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq.*, as alleged in the above paragraphs of this complaint, which are incorporated herein by reference.

Violations of California's Automatic Renewal Law

81.     Specifically, Defendant failed, and continues to fail, to: (a) provide the automatic renewal terms associated with its Lovevery Subscription "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer[,]" in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Method, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Lovevery Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

82.     Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

83.     All products received from Defendant in violation of the ARL, Cal. Bus. Prof. Code §§ 17602, *et seq*., constitute "unconditional gifts."  *See* Cal. Bus. Prof. Code § 17603.

84.     As a direct and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the Class in the form of payments made by Plaintiff and the Class for their Lovevery Subscriptions.  Defendant has profited from its unlawful and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon.  Thus, Plaintiff has suffered injury in fact and lost money or property as a result of Defendant's violations of California's ARL.

85.     Defendant was prohibited from making these charges and taking Plaintiff's money without the required affirmative consent.  If Defendant had complied with the law, Defendant could not have made the charges, and would not have obtained this money from Plaintiff.

86.     <u>Violations of Other Statutes and Common Laws</u>

87.     Furthermore, as alleged below, Defendant has committed unlawful and/or unfair business practices under the UCL by: (a) representing that Defendant's goods and services have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); and (c) converting to Defendant's own use and benefit money that rightfully belongs to Plaintiff and the Class.

88.     Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

89.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

90.     Defendant's acts, omissions, nondisclosures, and misleading statements as alleged

herein were and are false, misleading, and/or likely to deceive the consuming public.

91.     Plaintiff and the members of the Class have suffered a substantial injury in fact and lost money by virtue of Defendant's acts of unfair competition, which caused them to purchase the Lovevery Subscriptions.  Had Defendant complied with its disclosure obligations under the ARL, Plaintiff and members of the Class would not have purchased their Lovevery Subscriptions or would have canceled their Lovevery Subscriptions prior to the renewal of the subscriptions, so as to not incur additional fees.  Thus, Plaintiff and members of the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices.

92.     Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful course of conduct.  The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the Lovevery Subscriptions are still used by Defendant today.

93.     Plaintiff and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendant charged or caused to be charged to Plaintiff's and the Class's Payment Methods in connection with their Lovevery Subscriptions during the four years preceding the filing of this Complaint.  Defendant should be required to disgorge all the profits and gains it has reaped and restore such profits and gains to Plaintiff and the Class, from whom they were unlawfully taken.

94.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and members of the Class seek a court order enjoining Defendant from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

95.     Plaintiff, individually and on behalf of similarly situated California consumers, brings this action as private attorneys general and to vindicate and enforce an important right affecting the public interest.  Plaintiff and the Class are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## COUNT II
### Conversion

96.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

97.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

98.     As a result of charges made by Defendant to Plaintiff's and Class members' Payment Methods without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiff and the Class.

99.     The amount of money wrongfully taken by Defendant is capable of identification.

100.    Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

101.    As a result of Defendant's actions, Plaintiff and the Class have suffered damages.

## COUNT III
### Violations of California's False Advertising Law ("FAL")
### Cal. Bus. & Prof. Code Code §§ 17500, *et seq*

102.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

103.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

104.    Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and

which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading.  Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

105.    Defendant's statements include but are not limited to representations and omissions made to consumers before and after enrollment in Defendant's Lovevery Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments.  For instance, Defendant's representation on the Checkout Pages of the Lovevery Website that members can "Pay per Kit" at the specified amount (*e.g.*, months 11-12 at $80.00) is contradicted by their policy set forth elsewhere to charge a higher price for it play-kits once a child passes a certain age (*e.g.*, months 13,14,15 at $120.00) unless they cancel the Lovevery Subscription before the next charge. In light of Defendant's disclosure of the former and silence as to the latter on the Checkout Pages for the Lovevery Subscriptions, the representations and omissions on the Checkout Pages constitute false and deceptive advertisements.  Similarly, Defendant misleads consumers into believing that they would only be enrolling in a "Pay per Kit" subscription on the Checkout Page and then burying within a barely legible block of text at the bottom of the Acknowledgement Email that consumers' "credit card will be charged automatically" regardless of their manifestation of assent.

106.    Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

107.    Defendant knew that its actions were misleading based on the sheer number of complains that it has received from consumers who were unwillingly enrolled into its Lovevery Subscriptions under false pretenses.

108.    Plaintiff and the members of the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for their Lovevery Subscriptions, and other California consumers and members of the public were also or are likely to be deceived as well.  Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions.  Plaintiff and other members of the Class did not learn of Defendant's

Lovevery Subscription price, cancellation, and automatic payment policies until after they had already signed up and started paying for Defendant's Lovevery Subscription.  Thus, they relied on Defendant's statements and omissions to their detriment.

109.    Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased the Lovevery Subscriptions on the same terms if the true facts were known about the product and the Lovevery Subscriptions do not have the characteristics or the purchase price as promised by Defendant.

110.    Plaintiff, individually and on behalf of all similarly situated California consumers, seeks individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with its false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

### COUNT IV
### Violations of California's Consumers Legal Remedies Act ("CLRA"),
### Cal. Civ. Code §§ 1750, *et seq*

111.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

112.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

113.    Plaintiff and the members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

114.     Defendant's selection and/or subscription offers and the video, music, and other products pertaining thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b).  The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

115.    The acts and practices of Defendant as described above were intended to deceive Plaintiff and the Class as described herein, and have resulted, and will result, in damages to

Plaintiff and the Class.  These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations or omissions deceiving that the Lovevery Subscriptions have characteristics, uses, and/or benefits, which they do not have, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices constitute  the advertisement of the goods in question without the intent to sell them as advertised, in violation  of Cal. Civil Code § 1770(a)(9).

116.     Plaintiff and the Class suffered economic injury as a direct result of Defendant's misrepresentations and/or omissions because they were induced to purchase Lovevery Subscriptions and/or pay renewal fees they would not have otherwise purchased and/or paid.  Had Defendant fully and clearly disclosed the terms and purchase price associated with the Lovevery Subscriptions, Plaintiff and the Class would have not subscribed to the Lovevery Subscriptions, or they would have cancelled their Lovevery Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

117.     Plaintiff, on behalf of herself and all other members the Class, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

118.     In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant on March 3, 2023, informing Defendant of her intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."  Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiff Haymond will amend her complaint to include a request for damages as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

## COUNT V
### Unjust Enrichment / Restitution

119.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

120.     Plaintiff brings this claim individually and on behalf of Class members under the laws of the State of California.

121.     To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. Proc. 8.

122.     Plaintiff and the Class conferred benefits on Defendant by purchasing the Lovevery Subscriptions.

123.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Class's purchases of the Lovevery Subscriptions.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant's failure to disclose material terms of the purchase agreement, in violation of California law, induced Plaintiff and the Class to purchase the Lovevery Subscriptions.  These omissions caused injuries to Plaintiff and the Class because they would not have purchased the Lovevery Subscriptions at all, or on the same terms if the true facts were known.

124.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT VI
### Negligent Misrepresentation

125.     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

126.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

127.     As discussed above, Defendant misrepresented in its advertisements and related statements made in connection with the sign-up and purchase processes for and terms of cancellation of the Lovevery Subscriptions.  Defendant omitted, failed to disclose, and intentionally concealed from such advertisements and related statements material facts concerning billing, cancellation, and automatic payment terms, policies, and requirements.

128.     At the time Defendant made these representations, Defendant knew or should have

known that these representations were false or made them without knowledge of their truth or veracity.

129.    At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Lovevery Subscriptions and their associated terms.

130.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase and enroll in Defendant's Lovevery Subscription program.

131.    Plaintiff and Class members would not have purchased the Lovevery Subscriptions if the true facts had been known.

132.    The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

<u>**COUNT VII**</u>
**Fraud**

133.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

134.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

135.    As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the Lovevery Subscriptions and their associated automatic renewal terms, including terms regarding Defendant's cancellation policy and billing practices and policies.  These misrepresentations and omissions were made by Defendant with knowledge of their falsehood.

136.    The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Lovevery Subscriptions.

137.    The fraudulent actions of Defendant caused damage to Plaintiff and the members of the Class, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.   For an order certifying the Class, naming Plaintiff as a representative of the Class, and appointing Plaintiff's attorneys as Class Counsel to represent the Class;

b.   For an order declaring Defendant's conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein

d.   For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of equitable monetary relief;

g.   For injunctive relief as pleaded or as the Court may deem proper; and

h.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  March 3, 2023                    **BURSOR & FISHER, P.A**.

By: ___*/s/ Neal J. Deckant*___
Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com
            jvenditti@bursor.com

**BURSOR & FISHER, P.A**
Frederick J. Klorczyk III (State Bar No. 320783)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: fklorczyk@bursor.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GUCOVSCHI ROZENSHTEYN, PLLC**
Adrian Gucovschi (*pro hac vice* forthcoming)
630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
Email: adrian@gr-firm.com

*Attorneys for Plaintiff and the Putative Class*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Neal J. Deckant, declare as follows:

1.     I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Kelly Haymond in this action.  Plaintiff alleges that she is a citizen of California who resides in Lancaster, California.  Further, Plaintiff alleges that, at the time of her initial enrollment in the Lovevery Subscription, and for a majority of the subscription charges she subsequently incurred in connection with her Lovevery Subscription, she was a citizen of California who resided in Rosamond, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Eastern District of California, and Defendant regularly does business in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California, this 3rd day of March, 2023.

_/s/ Neal J. Deckant_
Neal J. Deckant
